USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:___12/13/2013___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                                                  :
YAMA CAPITAL LLC,                                                 :
                                                                  :
                                        Plaintiff,               :        12 Civ. 7159 (KPF)
                            v.                                    :
                                                                  :        OPINION AND ORDER
CANON INC., *et al.*,                                            :
                                                                  :
                                        Defendants.              :
                                                                  :
------------------------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

Plaintiff Yama Capital LLC ("Plaintiff") is the assignee of a patent that teaches a method of accounting for spatial noise characteristics in digital image acquisition systems. In September 2012, Plaintiff filed an action against Defendants Canon Inc. and Canon U.S.A., Inc. (collectively, "Defendants"), claiming patent infringement with respect to nine of Defendants' cameras. Pending before the Court is Defendants' motion to strike Plaintiff's revised infringement contentions. For the reasons set forth in the remainder of this Opinion, Defendants' motion is granted in part; Plaintiff's infringement contentions are struck with leave to file amended contentions.

# FACTUAL BACKGROUND[1]

The patent-in-suit, U.S. Patent No. 6,069,982 (the "'982 patent"), was developed in the Polaroid Image Science Laboratory and issued by the United States Patent and Trademark Office in May 2000.  The '982 patent was then acquired by Plaintiff in or around 2008 as part of the sale of Polaroid's assets during its bankruptcy.  (Pl. Opp. 2-3).  The patent is entitled "Estimation of Frequency Dependence and Grey-Level Dependence of Noise in an Image." (Compl. ¶ 9).  According to Plaintiff, "[t]he '982 Patent generally discloses and claims technology to update default data and parameters relating to spatial noise characteristics in a digital image acquisition system." (*Id.*).  "Noise," in this context, refers to various types of distortion introduced into an image by the process of capturing it.

Plaintiff alleges that nine different cameras[2] produced by Defendants infringe claims 1, 2, and 4 of the '982 patent, set forth below:

(1)   Estimating spatial noise characteristics associated with an image acquired from a digital image acquisition device having unknown spatial noise characteristics, by a method comprising the steps of:

Providing predetermined default values for the spatial noise characteristics of the digital image acquisition device;

---

[1]   The facts throughout are drawn from the Complaint ("Compl."), Defendants' Memorandum of Law in Support of their Motion to Strike Plaintiff's Infringement Contentions ("Def. Br."), Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Strike Plaintiff's Infringement Contentions ("Pl. Opp."), Defendants' Reply Memorandum of Law in Further Support of their Motion to Strike Plaintiff's Infringement Contentions ("Def. Reply"), the Infringement Contentions ("Infringement Contentions" or "I.C.") and supporting claim charts ("Claim Charts"), and the transcript of the July 24, 2013 conference ("7/24/13 Tr.").

[2]   The accused Canon cameras are the EOS 5D Mark II, the EOS 7D, the EOS 60D, the Rebel T3i, the PowerShot G1X, the PowerShot S100, the EOS 650D/Rebel T4i, the EOS 5D Mark III, and the EOS-1DX.

> Gathering information related to the spatial noise characteristics of the digital image acquisition device;
>
> Generating replacement data in response to said gathered information;
>
> Updating said predetermined default spatial noise characteristics associated with the digital image acquisition device with said replacement data.

    (2)    The method of claim 1 wherein the step of gathering information comprises gathering user information related to the spatial noise characteristics of the digital image acquisition device.

    (4)    The method of claim 1 wherein the step of gathering information comprises gathering, from the acquired image, image data related to the spatial noise characteristics of the digital image acquisition device.

(Dkt. #37, Ex. 1). Dependent claims 2 and 4 differentiate from independent claim 1 only in specifying alternative forms of the "gathering" limitation. *See generally Wahpeton Canvas Co., Inc.* v. *Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989) ("[A] dependent claim includes all the limitations of the claim from which it depends....").

On June 7, 2012, Plaintiff's licensing counsel sent a copy of the '982 patent to Defendants' United States office, indicating Plaintiff's belief that Defendants infringed claims of the patent and inviting Defendants to enter into licensing negotiations. (Compl. ¶ 14). On June 12, Defendants responded, confirming receipt of the '982 patent. (*Id.*).

Having received no further response, on September 21, 2012, Plaintiff filed the Complaint in this action, alleging that nine of Defendants' cameras infringe the '982 Patent. (Compl. ¶¶ 10-12). The case was designated for

3

inclusion in the Pilot Project Regarding Case Management Techniques for Complex Civil Cases in the Southern District of New York.  (Dkt. #2).  As part of that Project, on January 25, 2013, the Court adopted Patent Disclosure Rules 1-1(b) and 1-1(c) (the "Rules") at the parties' request; the Rules tracked the Northern District of California's Patent Local Rules 3-1(b) and 3-1(c).  (Dkt. #21).

Pursuant to the Rules, Plaintiff served its Preliminary Infringement Contentions, supporting Claim Charts, and related documents on April 1, 2013.  (Pl. Opp. 2).  Defendants disputed the adequacy of these contentions via correspondence exchanged with Plaintiff on April 12, 2013, and April 19, 2013.  (*Id.*).  Plaintiff thereupon agreed to submit revised contentions and the parties agreed to stay all other deadlines in the case.  (Dkt. #26).

On May 22, 2013, Plaintiff submitted its Revised Preliminary Infringement Contentions.  (*See* Dkt. #37, Ex. 3).  Defendants, by letter dated June 27, 2013, then sought a pre-motion conference with the Court preparatory to moving to strike the revised contentions.  (*Id.*).  A pre-motion conference was held on July 24, 2013, during which the Court set a briefing schedule for the motion.  (Dkt. #32).

On August 12, 2013, Defendants filed their motion to strike Plaintiff's Revised Preliminary Infringement Contentions and supporting Claim Charts (Dkt. #35), a memorandum of law in its support (Dkt. #36), and an attorney declaration with supporting exhibits (Dkt. #37).  Plaintiff responded on September 3, 2013, with a memorandum of law opposing Defendants' motion

4

(Dkt. #38), and an attorney declaration with supporting exhibits (Dkt #39).

Defendants filed a reply memorandum in further support of their motion on

September 9, 2013.  (Dkt. #40).

## DISCUSSION

### A.   Applicable Law

Patent Disclosure Rule 1-1(b) requires a litigant claiming infringement to

provide:

> Separately for each asserted claim, each accused apparatus, product, device, process, method, act, or other instrumentality ("Accused Instrumentality") of each opposing party of which the party is aware.  This identification shall be as specific as possible.  Each product, device, and apparatus shall be identified by name or model number, if known.  Each method or process shall be identified by name, if known, or by any product, device, or apparatus which, when used, allegedly results in the practice of the claimed method or process.

(Dkt. #21, Att. A).

Patent Disclosure Rule 1-1(c) further requires a litigant claiming

infringement to provide:

> A chart identifying specifically where each limitation of each asserted claim is found within each Accused Instrumentality, including for each limitation that such party contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in the Accused Instrumentality that performs the claimed function.[3]

(*Id.*).

---

[3]   Neither party contends that § 112(6) or its attendant disclosure requirements are implicated here.

Patent disclosure rules are "a discovery device that set forth the standards for disclosing asserted claims and infringement contentions." *Infineon Techs.* v. *Volterra Semiconductor*, No. C-11-6239 (MMC) (DMR), 2013 WL 322570, at *3 (N.D. Cal. Jan. 28, 2013).[4]  Infringement Contentions submitted under the Rules "take[] the place of 'a series of interrogatories that defendants would likely have propounded had the patent local rules not provided for streamlined discovery.'"  *InterTrust Techs. Corp.* v. *Microsoft Corp.*, No. C-01–1640 (SBA), 2003 WL 23120174, at *1 (N.D. Cal. Dec.1, 2003) (quoting *Network Caching Tech., LLC* v. *Novell, Inc.*, No. C-01-2079 (VRW), 2002 WL 32126128, at *4 (N.D. Cal. Aug. 13, 2002)).  "Taken together, [the Patent Disclosure Rules] mandate[] that a plaintiff's infringement contentions 'must be sufficient to provide reasonable notice to the defendant why the plaintiff believes it has a reasonable chance of proving infringement' and 'to raise a reasonable inference that all accused products infringe.'"  *Infineon*, 2013 WL 322570, at *3 (quoting *Shared Memory Graphics, LLC* v. *Apple Inc.*, No. C-10-2475 (MMC) (JSC), 2011 WL 3878388, at *4 (N.D. Cal. Sept. 2, 2011)).

---

[4]     The Rules here track analogous rules in the Northern District of California, *see* Patent Local Rules, United States District Court, Northern District of California, http://www.cand.uscourts.gov/localrules/patent, and in the Eastern District of Texas, *see* Appendix M, Patent Rules, http://www.txed.uscourts.gov/cgi-bin/view_document.cgi?document=1179.  Accordingly, the Court will consider decisions from those districts in resolving this motion.  *Cf. Voxpath RS, LLC* v. *LG Electronics U.S.A., Inc.*, No. 2:12-CV-952 (DMC) (MF), 2012 WL 5818143, at *3 n.3 (D.N.J. Nov. 14, 2012) ("As the District of New Jersey has developed its Local Patent Rules through guidance from corresponding rules in the Northern District of California and the Eastern District of Texas and the issues raised in [a motion to strike infringement contentions] are not widely analyzed in this District, this Court has allowed for consideration of those districts' decisions.")

The Rules "require[] plaintiffs to disclose their preliminary infringement contentions before discovery has even begun," *American Video Graphics, L.P.* v. *Electronic Arts, Inc.*, 359 F. Supp. 2d 558, 560 (E.D. Tex. 2005).  As such, a plaintiff "must provide 'particular theories of infringement with sufficient specificity to provide defendants with notice of infringement beyond that which is provided by the mere language of the patent rules themselves.'"  *Linex Techs., Inc.* v. *Belkin Int'l, Inc.*, 628 F. Supp. 2d 703, 713 (E.D. Tex. 2008) (quoting *STMicroelectronics, Inc.* v. *Motorola, Inc.*, 308 F. Supp. 2d 754, 755 (E.D. Tex. 2004)).

Infringement contentions "'are not meant to provide a forum for litigation of the substantive issues; they are merely designed to streamline the discovery process.'"  *STMicroelectronics*, 308 F. Supp. 2d at 755 (quoting *Network Caching*, 2003 WL 21699799, at *4-5).  At this stage, the issue is not "the merits of Plaintiff's contentions," but only "whether Plaintiff's Infringement Contentions fulfill the particular requirements of" the Patent Disclosure Rules "by disclosing sufficiently detailed information."  *Linex Technologies*, 628 F. Supp. 2d at 713.  It is not enough, however, to "recite[] language from the claims at issue and provide[] corresponding images with some textual explanations."  *H-W Tech., L.C.* v. *Apple, Inc.*, No. 3:11-CV-0651-G, 2012 WL 3650597, at *5 (N.D. Tex. Aug. 2, 2012), *report and recommendation adopted sub nom. H-W Tech., L.C.* v. *Amazon.com, Inc.*, No. 3:11-CV-0651-G (BH), 2012 WL 3656293 (N.D. Tex. Aug. 27, 2012).  "The purpose of [the Rules] is in fact to be nit picky, to require a plaintiff to crystallize its theory of the case and patent

7

claims." *InterTrust*, 2003 WL 23120174, at *3.  "Plaintiff has the burden of providing infringement contentions that identify specifically and in detail where each claim element is found in the accused products, 'so that the Court can make a principled decision on whether discovery will proceed.'" *Id.* at *5 (quoting *Bender* v. *Maxim Integrated Prods., Inc.*, No. C-09-1152 (SI), 2010 WL 1135762, at *2 (N.D. Cal. Mar. 22, 2010)).

Where Infringement Contentions are found inadequate, courts can dismiss the case entirely if they prove inadequate beyond a plaintiff's capacity to cure, or may impose "[l]esser discovery sanctions, including an order to amend" the infringement contentions; the latter may be "a more appropriate resolution to what is, essentially, a discovery dispute." *Samsung SDI Co., Ltd.* v. *Matsushita Elec. Indus. Co., Ltd.*, No. CV 05-8493 (PA) (SJHX), 2006 WL 5097360, at *1 n.1 (C.D. Cal. June 5, 2006).  Even where a defendant "only moves to strike the infringement contentions, the motion may be construed as a motion to strike as well as an alternative motion to compel more detailed infringement contentions." *H-W Tech*, 2012 WL 3650597, at *8 n.4 (citing *Morningware, Inc.* v. *Hearthware Home Prods., Inc.*, No. 09-C-4348, 2010 WL 3781254, at *1 (N.D. Ill. Sept. 22, 2010)).

## B.    Application

Though Plaintiff employs different modalities (with varying degrees of detail) to identify its infringement contentions, it nonetheless fails to satisfy the Rules in several ways.  First, Plaintiff cannot find infringement in isolated claim limitations, taken out of context, that are unrelated to other limitations that

together (and only together) constitute the claimed method.  This is because the Rules require the identification not merely of claim limitations, but also of those limitations as part of an infringing process.  *See Linex Technologies*, 628 F. Supp. 2d at 713 n.9 ("Plaintiff is required to explain how each Accused Product infringes each asserted claim….").

Second, Plaintiff cannot rely on an unspecified matrix of combinations of "primary features," each allegedly infringing in their own right, with "secondary features" whose infringement arises only as a function of the combination. This attempt to identify a "combination" infringement contention is ambiguous and inadequately specific.

Third, Plaintiff's fails in its efforts to identify "primary features" that allegedly infringe the asserted claims.  In this regard, Plaintiff's Infringement Contentions rely on the ISO and High ISO Noise Reduction features, while its Claim Charts rely on the Long Exposure Noise Reduction and Chromatic Aberration Correction features.[5]  As to none of these four features does Plaintiff identify, with adequate specificity, the "providing" or the "generating" limitations of claim 1 of the '982 patent.  Inasmuch as the other asserted claims of the '982 patent are dependent claims, this failure dooms the identifications with respect to claims 1, 2, and 4.

Where a plaintiff's Infringement Contentions are inadequately specific, the plaintiff cannot obtain discovery without amending its contentions to provide more detail.  Here, in the absence of any satisfactory crystallization of

---

[5]     Each of these features is discussed in greater detail in the appropriate section of this Opinion.

Plaintiff's theories of infringement, Defendants' motion to strike is granted, with leave for Plaintiff to file amended infringement contentions.

1. **Identified Features Must Infringe on the Claim as a Whole, Not Merely Individual Limitations Thereof**

At the outset, the parties dispute the level of generality at which analysis of the Infringement Contentions should operate — or, for lack of a better term, the appropriate "unit of infringement." Plaintiff's Infringement Contentions refer to each camera as an Accused Instrumentality for patent disclosure purposes (I.C. at 2), but the bulk of its Infringement Contentions and Claim Charts cite individual processes, or features, performed by each camera's software (*see, e.g., id.* at 3 ("When non-default parameters are selected or set for ISO, High ISO NR, chromatic aberration correction, or long exposure noise reduction alone or in combination, claims 1 and 3 are directly infringed.")).

Defendants, by contrast, cast aside Plaintiff's Accused Instrumentality designations, and attack the Infringement Contentions based on the sufficiency of the camera features as independent infringement accusations. (*See, e.g.,* Def. Br. 8 ("[Plaintiff] asserts that use of a number of different features infringes its claimed method. Each of these allegedly infringing methods is an 'Accused Instrumentality' under the Rules.")). Unless a given feature is specifically alleged to infringe each limitation of a claim, Defendants argue, the Infringement Contentions must be struck as inadequate. Plaintiff characterizes this approach to its Infringement Contentions as "peculiar, and wrong" (Pl. Opp. 17), and reiterates that its accusations focus on cameras (*see id.* at 6). Plaintiff also correctly notes that when "claim limitations … are implemented in

software[, the Rules] do not require the identification of specific routines and data when the source code is solely in the possession of the defendant." (*Id.* at 9). The identification of individual features, Plaintiff argues, is thus no more than an effort "to provide a more specific identification of the software within the accused camera that satisfies the limitations of the asserted claims, not because the features represent separate instrumentalities." (*Id.* at 10).

Plaintiff's argument only gets it so far. Infringement contentions must specifically identify how a plaintiff believes an asserted claim's limitations are practiced by some feature or process of an accused camera, and cannot merely incorporate blanket accusations against "camera software" as a whole. Plaintiff is free to identify cameras as a whole as Accused Instrumentalities for patent disclosure purposes, so long as Plaintiff can provide adequate Infringement Contentions with respect to those Accused Instrumentalities. After all, Rule 1-1(c) requires Plaintiff's Claim Charts to "identify[] specifically where each limitation of each asserted claim is found *within* each Accused Instrumentality." Patent Disclosure Rule 1-1(c) (emphasis added). It is not enough, then, to allege that a camera's "software" infringes each element of each claim; Plaintiff must demonstrate that each limitation is found "within" the Accused Instrumentality at some specific place.

This does not, as Plaintiff portends, require Plaintiff to provide early in this litigation "the identification of specific routines and data when the source code is solely in the possession of the defendant." (Pl. Opp. 9). The Court agrees with Plaintiff that such a requirement would be "impossible" (*id.*), and

even Defendants do not demand such specificity (*see* Def. Reply 5). The Rules do require, however, that Plaintiff express with clarity and specificity in its Infringement Contentions and Claim Charts, based on the information to which it reasonably has access before discovery proceeds, a reasonable basis for believing that Defendants "infringed at least *one claim* of" the '982 patent. *McKesson Info. Solutions LLC* v. *Epic Sys. Corp.*, 242 F.R.D. 689, 694-95 (N.D. Ga. 2007) (emphasis added). To do otherwise would be to compel Defendants to produce confidential proprietary source code based only on untethered (or insufficiently tethered) assumptions. *See, e.g.*, *Bender*, 2010 WL 1135762, at *2 ("The Court will not order defendant to produce proprietary schematics for over 200 products based on an assumption."). Compliance with the Rules cannot be accomplished, as Plaintiff urges, simply by a flat statement in a claim chart that Plaintiff believes that a claim limitation exists within a particular accused camera. Rather, Plaintiff must allege specific ways in which that limitation exists, with as much specific identifying information as is reasonably available without discovery.

In addition to contravening the text of the Rules, Plaintiff's argument is also undermined by its own Claim Charts, which, in the main, specify particular features that allegedly infringe on a limitation of an asserted claim of the '982 patent. If Plaintiff actually believed the first defense it offers here, its Claim Charts would have been developed in a very different and much more superficial form, simply stating that a camera's software, in some unspecified fashion, practiced the claims of the '982 patent. That Plaintiff did not do so

12

strongly suggests that it was aware of its true obligations under the Rules: to make specific identification of individual features infringing each limitation of each claim.

Nor can Plaintiff merely identify individual limitations unrelated to a claimed method as a whole.  *See McKesson*, 242 F.R.D. at 695 (noting that demonstrating a reasonable basis to believe that an accused product infringes on a patent claim "of course[] requires a reasonable belief that the accused infringing system meets each and every element of one of those claims").  Here, Defendants' attack on the Infringement Contentions proceeds from the assumption that the Infringement Contentions must identify how the "claimed method" is practiced by the Accused Instrumentality.  (Def. Br. 8).  The premise of this argument appears to be that, as the '982 patent identifies "a method comprising" four steps providing the limitations of the claims, Plaintiff must identify not only that the limitations of the claims are *found* within the Accused Instrumentalities, but also that each limitation is practiced as part of a coherent process that relates all the claim's limitations to each other in the manner contemplated by the '982 patent.  That is, Defendants posit that Plaintiff must allege not merely that a given camera software "gathers" certain data using one feature, and also "updates" certain data in an unrelated way using a different feature; in Defendants' view, Plaintiff's Infringement Contentions must identify how a given camera's software, through some process or combination of interrelated processes, "gathers" certain data, uses

13

that very data to "generate" replacement data, and uses that very replacement data to "update" the original default data employed by that same process.

Plaintiff unsurprisingly does not accept this premise.  Instead, Plaintiff's construes its obligation under the Rules as merely to demonstrate the basis for its belief "that the camera software performs the steps of the claimed method." (Pl. Opp. 7).  Thus, so long as each limitation of each asserted claim is linked to "any particular feature" of a given camera's software, regardless of whether those features interact or form a "method" as contemplated by the terms of '982 patent, Plaintiff believes it has adequately met the identification requirements of the Rules.

Plaintiff's approach is again at odds with the plain language of the Rules, which requires that "[e]ach *method or process* shall be identified by name, if known, or by any product, device, or apparatus which, when used, allegedly results in the practice of the claimed method or process."  Patent Disclosure Rule 1-1(b) (emphasis added).  As Plaintiff acknowledges, the Rules require a plaintiff to demonstrate a belief "that the camera software performs the steps of the claimed method" (Pl. Opp. 7), not that it performs a series of unconnected acts that, were they arranged correctly, would constitute the claimed method. A patent plaintiff must identify the limitations of the asserted claims in a way that provides a basis for believing those limitations actually interrelate to perform the claimed method.  *See SAGE Electrochromics Inc.* v. *View Inc.*, No. C-12-06441 (JST) (DMR), 2013 WL 4777164, at *1 (N.D. Cal. Sept. 6, 2013) (observing that the Patent Disclosure Rules require an infringement plaintiff to

14

"'compare an accused product to its patents on a claim by claim, element by element basis for ... defendant's products'" (quoting *Network Caching*, 2002 WL 32126128, at *5) (alteration in original)).  Plaintiff's contrary view — under which it could provide adequate Infringement Contentions simply by locating individual limitations of the claims of the '982 patent inside the software of the accused cameras, without regard to how or whether those limitations relate as set forth in the asserted claims — would allow it to gain discovery of Defendants' proprietary source code without ever providing any basis to believe that the accused software actually infringes on any claim of the '982 patent. That cannot be the law.  *Cf. View Eng'g, Inc.* v. *Robotic Vision Sys., Inc.*, 208 F.3d 981, 986 (Fed. Cir. 2000) (requiring patent plaintiffs to "conclude that there is a reasonable basis for a finding of infringement of at least *one claim* of each patent so asserted" (emphasis added)).  Instead, Plaintiff can only properly obtain discovery if it can identify, with the requisite specificity given the information presently available to it, features of the accused cameras that, "when used, allegedly result[] in the practice of the" method claimed in claims 1, 2, or 4 of the '982 patent.

### 2.    Plaintiff's Combination Theory Is Inadequate

Plaintiff's second, "combination theory" of identifying its theories of infringement fares no better.  Several of Plaintiff's Infringement Contentions identify "additional spatial noise characteristics" of the accused cameras: "Peripheral Illumination, Highlight Tone Priority, White Balance, Filter Effects,

Flash Exposure, Image Quality, Image Size, and Live View Image." (I.C. at 3).

In a footnote, Plaintiff asseverates that

> [a]t a minimum, Claims 1, [2],[6] and 4 are infringed when non-default parameters are selected or otherwise set for these spatial noise characteristics when combined with non-default parameters for any one of ISO, High ISO NR, long exposure noise reduction, or chromatic aberration correction.

(*Id.* at n.1).[7] This contention suggests that when one of the four primary identified features is employed in combination with secondary features modifying one of the "additional spatial noise characteristics," a separate act of infringement takes place. (I.C. at 3). Because Plaintiff has failed to explain adequately how these secondary features actually infringe individual limitations of the asserted claims — and, perhaps worse yet, has made no effort to explain how these secondary features work in combination with other primary features to infringe claims as a whole — its "combination theory" does not provide adequate notice to Defendants regarding what discovery Plaintiff might seek in connection with this theory. It must therefore be struck.

The fundamental flaw in Plaintiff's combination theory is Plaintiff's failure to explain its belief that these secondary features, in combination with primary features, infringe on a claim of the '982 patent. Plaintiff may believe that infringement arises because, when employed in combination with some primary feature, a secondary feature effectively creates a distinct process that also infringes on a claim of the '982 patent. It may instead believe that

---

[6]    The Infringement Contentions refer in this footnote to claim 3 of the '982 patent. The Court assumes that this is a typographic error.

[7]    The four specifically identified features are dealt with separately at greater length below.

features modifying the "additional spatial noise characteristics" practice some, but not all, of the limitations of a claim of the '982 patent, and thus only infringe a claim when bootstrapping off the infringing process of another feature.[8]  Whatever the infringement theories, Plaintiff's current explanation permits neither Defendants nor the Court to understand them, and thus fails to satisfy the specificity requirement of the Rules.  *See, e.g.*, *Linex Technologies*, 628 F. Supp. 2d at 711 (rejecting infringement contentions that failed "to identify with any level of detail how the Accused Products infringe the asserted claims" and made "no specific references to any of the Accused Products").

The Claim Charts provide no further illumination into the combination theory.  Taking as exemplary the Chart prepared for accused camera EOS 7D, Plaintiff identifies that camera's "Highlight Tone Priority" feature in citations 1pre(3), 1a(2), 1b(1), 1b(2), 1b(10), 1b(11), and 1d(5).  (*See* Claim Charts at 40, 48, 52, 55, 62, 63, 71).  Yet none of these citations provides even an attenuated explanation of how Plaintiff believes the "Highlight Tone Priority" feature actually practices any limitation of claim 1.  In citation 1a(2), for example — the sole explanation of how "Highlight Tone Priority" practices the "providing" limitation of claim 1 — Plaintiff merely provides an image of the EOS 7D's "Function Availability Table," a list of every function available to users of the camera, and explains that "[a]part from the automatic mode … in which functions are automatically (pre-determined) set by the device itself, all other

---

[8]     As explained below, this alternative is foreclosed not only because Plaintiff failed to explain it, but also because the Infringement Contentions do not adequately identify how any feature infringes on a claim of the '982 patent.

modes can be customized by the user." (Claim Charts at 49-50). Plaintiff provides no indication of why it believes that the "Highlight Tone Priority" feature has a relationship to the '982 patent's claims, nor does it hint at how that setting might interact with another feature to infringe an asserted claim.

Plaintiff seeks to elide its disclosure obligations by providing, at the beginning of each set of citations, a boilerplate disclaimer to the effect that "Default data for spatial noise characteristics are structured by the accused camera software as default data. The specific default data are unknown but correspond to the default settings set forth below as citations 1a(x) and 1b(x)." (Claim Charts at 45). Plaintiff relies on these disclaimers in opposing the instant motion, noting that the "form of the data and information is not known because it is 'structured' or 'defined' by the accused camera software" (Pl. Opp. 7), and arguing from this proposition that it should not be forced to provide more specific identification of infringement "in the absence of a review of [Defendants'] source code" (*id.* at 12).

Plaintiff is unquestionably correct that the Rules demand specificity, not prescience: Plaintiff need not explain how Defendants' software functions on a programming level without access to that software. That truism being established, it remains the case that the information provided in Plaintiff's Infringement Contentions and Claim Charts falls far short of "provid[ing] reasonable notice to the defendant why the plaintiff believes it has a 'reasonable chance of proving infringement.'" *Shared Memory Graphics*, 812 F. Supp. 2d 1022, 1027 (N.D. Cal. 2010) (quoting *View Eng'g*, 208 F.3d at 986)).

18

Put differently, Plaintiff need not provide citations to software modules or lines of code to which it does not yet have access; it is, however, obliged to explain what it believes the data involved to be, and how those data relate to the method as a whole taught in the '982 patent's asserted claims. *H-W Tech*, 2003 WL 23120174, at *5 ("Plaintiff has the burden of providing infringement contentions that identify specifically and in detail where each claim element is found in the accused products...."). This Plaintiff has failed to do.

Separate and apart from their silence on the individual "additional spatial noise characteristics," neither the Infringement Contentions nor the Claim Charts in any way explain, or even suggest, the nature of the "combination" theory set forth in the Infringement Contentions. Nowhere in the Claim Charts does Plaintiff indicate any reason to believe that functions affecting the "additional spatial noise characteristics" work together with any other camera functions to reduce the noise of the captured image. Indeed, as Defendants point out, Plaintiff did not even attempt to document the kind of functional testing that Plaintiff elsewhere adduced in support of its contentions or previewed for the Court at the July 24 conference. (Def. Br. 10; *see also* 7/24/13 Tr. 25:12-25 ("Now we suspect that when the user [employs a feature affecting an additional spatial noise characteristic] that it's going to have some influence on the noise reduction in the camera, that the noise reduction algorithm is going to be altered in some fashion.... Now we don't know that, so what we have said is that really only in a situation where a non-default selection is made with respect to these additional features, only if it's in

19

combination with one of the features that we did in fact test, in that case it would be infringing.")).  There is similarly no analysis of images showing that the level of noise or noise reduction varies in relation to the use of features affecting the "additional spatial noise characteristics."  Indeed, Plaintiff provides no basis to believe that the "additional spatial noise characteristics" interact with a noise-reduction process at all.  *See, e.g.*, *H-W Tech.*, 2012 WL 3650597, at *3 ("Plaintiff does not argue that the missing information is not known or not readily ascertainable.").

Plaintiff's argument in defense of its "combination" approach, and its correlative justification for the dearth of explanation that these secondary features infringe the claims of the '982 patent, is curious:

> [W]here the software gathers information from, and the extent to which such data is utilized for purposes of noise reduction by the image processing software, does not change the nature of the infringement allegation in this case.…  Because of the nature of the testing that was done to generate a reasonable inference of infringement, and the nature of the infringement allegation in this case, these secondary features stand or fall with the overall infringement allegation against the accused cameras.

(Pl. Opp. 17).  Either Plaintiff means to argue that it may contend certain features of the camera software infringe the '982 patent without providing any reasonable basis for the belief that they are related in any way to the subject matter of the claims at issue (here, noise reduction), or Plaintiff means to argue that it need not do so with respect to "secondary" features, inasmuch as they only infringe when in combination with the "primary" features.  Neither version of this argument suffices.  The former construction clearly contradicts the plain language and unmistakable purpose of the Rules, *viz.*, to compel patent

plaintiffs to identify with specificity how the accused instrumentality practices each limitation of the implicated claim.  The latter construction would seem nothing more than a confession that Plaintiff lacks any reasonable basis to believe that the "secondary" features actually infringe at all.  Especially given that, as discussed below, Plaintiff has also failed to shoulder its burden of identifying how the "primary" features practice each limitation of the implicated claims, this latter construction is particularly unavailing.

As noted, infringement contentions are intended to crystallize the nature of a plaintiff's allegations and to focus subsequent discovery.  *See Connectel, LLC* v. *Cisco Sys., Inc.*, 391 F. Supp. 2d 526, 527 (E.D. Tex. 2005) ("[W]hen parties formulate, test, and crystallize their infringement theories before stating their preliminary infringement contentions, as the Patent Rules require, the case takes a clear path, focusing discovery on building precise final infringement or invalidity contentions and narrowing issues for *Markman*, summary judgment, trial, and beyond.").  The combination theory set forth in Plaintiff's Infringement Contentions falls short of this standard.

### 3.   Plaintiff Fails to Identify Individual Features with the Requisite Specificity

Finally, Plaintiff's particularized allegations against individual or "primary" features of the accused cameras do not identify the "generating" or "providing" limitations of the asserted claims with adequate specificity.  A patent plaintiff must, "to the extent appropriate information is reasonably available to it, ... disclose the elements in each accused instrumentality that it contends practices each and every limitation of each asserted claim." *Droplets,*

21

*Inc.* v. *Amazon.com, Inc.*, No. C12-03733 (HRL), 2013 WL 1563256, at *2 (N.D. Cal. Apr. 12, 2013).  Because Plaintiff has failed to do so here with respect to two limitations of the asserted claims, the Infringement Contentions must be struck.[9]

### a. Plaintiff Nowhere Adequately Identifies the "Generating" Limitation of the Claims

Plaintiff accuses nine separate cameras.  However, because of the similarity of firmware and software between different camera models, much of the material in the extensive Claim Charts is duplicative.  In the remainder of this section, the Court will consider the accused instrumentalities in sets of "cognate" cameras, *i.e.*, devices whose citations for the "generating" limitation are identical.[10]

The Court will address the EOS 5D Mark II first, effectively dealing at the same time with its cognate cameras.  Next, the Court will consider the material cited for the "generating" limitation with respect to different groups of cameras, considering whether any of that material provides sufficient identification of the "generating" limitation.  Ultimately, and as explained below, neither the ISO and High ISO Noise Reduction features identified in the Infringement

---

[9]     Plaintiff asserts three claims of the '982 patent: claims 1, 2, and 4.  Claims 2 and 4 are dependent on claim 1, as they are specific instances of the method set out in claim 1, and so the analysis below focuses only on the claim 1 limitations.  Because Plaintiff has failed to provide adequate crystallization of its infringement contentions regarding claim 1, Plaintiff has necessarily also failed to satisfy the Rules with respect to claims 2 and 4.

[10]    For example, the Claim Charts for the EOS 5D Mark II identify three "primary features" on which Plaintiff relies to demonstrate a reasonable basis for believing the camera infringes the '982 patent.  With respect to the "generating" limitation, the Claim Charts for the EOS 5D Mark II exactly duplicate the material cited for the "generating" limitation under three different cameras that share the same suite of allegedly infringing features: the EOS 7D, the EOS 60D, and the Rebel T3i.  (Claim Charts at 28, 66, 107, 146).

Contentions, nor the Long Exposure Noise Reduction and Chromatic

Aberration Correction features identified in the Claim Charts, provide

specificity sufficient to satisfy the Rules.

### i.     The EOS 5D Mark II

The EOS 5D Mark II charts include the following text for the "generating"

claim:

> Replacement data are generated by the camera software based on the information gathered relating to spatial noise characteristics as set forth in step 1(b).  The specific replacement data is unknown and defined by the camera software, but, on information and belief, the replacement data … correspond to the form of the default data.

> Please see evidence cited for Digic 4[11] in Preliminary Disclosure of Asserted Claims and Infringement Contentions 1-1(b).

> Please see evidence for Canon Rebel T3i citation 1b(5).

(Claim Charts at 28).  None of these three efforts at identification suffices.

The first paragraph, supported by no evidence whatsoever, provides no

reasonable basis to believe the EOS 5D Mark II infringes the "generating"

limitation.  Conclusory information-and-belief statements and recapitulations

of the claim language cannot satisfy the specificity requirement of the Rules.

*See Solannex, Inc.* v. *MiaSole, Inc.*, No. 11-CV-00171 (PSG), 2013 WL 1701062,

at *3 (N.D. Cal. Apr. 18, 2013) ("[S]imply alleging 'on information and belief'

and representing 'vague, conclusory, and confusing statements' does not

satisfy the requirement that the identifications be 'as specific as possible.'"

---

[11]     Each camera employs a digital image processor as part of the image capturing process. The nine accused cameras employ different processors: the Digic 4, the Digic 5, or the Digic 5+.  Plaintiff's Infringement Contentions are categorized by image processor, while its Claim Charts are categorized by camera.

(quoting *Theranos, Inc.* v. *Fuisz Pharma LLC*, No. 11–CV–05236 (YGR), 2012 WL 6000798, at *5 (N.D. Cal. Nov. 30, 2012))).

The second paragraph cites to the portion of the Infringement Contentions addressing the EOS 5D Mark II's image processor, the Digic 4. (Claim Charts at 5-8). These pages contain the metadata of an image, a noise analysis of images taken at successively higher ISO levels, a noise analysis of images taken with various High ISO Noise Reduction settings, and a noise analysis of images taken at successively higher ISO levels with various High ISO Noise Reduction settings.[12] In each case, in short, the Infringement Contentions explain that the ISO and High ISO Noise Reduction features infringe the asserted claims of the '982 patent because, in effect, changing the settings of either feature results in different levels of noise reduction. This argument is obviously defective because Plaintiff cannot obtain discovery simply by alleging that the accused cameras accomplish the goal sought in the '982 patent: Plaintiff must identify the individual limitations of the specific methods claimed in the '982 patent's asserted claims. It does not do so anywhere with respect to the ISO and High ISO Noise Reduction features discussed in the Infringement Contentions.

---

[12]    The ISO level of the camera, originally a system developed to track the speed at which film was exposed, also now analogously refers to the arbitrarily set sensitivity of the image sensor in a digital camera. Increasing the ISO setting causes both a more sensitive image sensor and, correspondingly, a higher degree of noise in the captured image. High ISO Noise Reduction is a feature which algorithmically seeks, depending on what setting the user selects, to remove certain types of noise from images captured at high ISO settings. (*See* Claim Charts at 5; 7/24/13 Tr. at 15:18-16:5).

In each case, the Infringement Contentions recite some variation on the observation that the quantity of noise reduction performed on the image varies with the variation in feature settings: "It is clear that the Noise Reduction levels increase as the ISO increases." (I.C. at 6). "It is clear that the Noise Reduction levels increase as the 'High ISO Noise Reduction (NR)' setting changes." (*Id.* at 7). "When the High ISO NR is enabled, the difference increases as the ISO increases. Furthermore, the difference is [consistently] higher with a High ISO NR set to Strong vs Standard." (*Id.* at 8). In each case, these observations end with the conclusion that the "ISO information" (*id.* at 6); the "High ISO NR information" (*id.* at 7); or "the High ISO NR setting" (*id.* at 8) is "gathered and used by the camera software to generate replacement data for the noise reduction performed by the Digic 4 processor" (*id.* at 6, 7, 8).

Plaintiff's syllogism proceeds thusly: The Digic 4 processor performs noise reduction; such noise reduction has some relationship to the setting of the ISO and High ISO Noise Reduction features; therefore, cameras using the Digic 4 processor must infringe the '982 patent. Indeed, Plaintiff makes this argument explicit in the Infringement Contentions:

> Functional testing confirms the degree of noise reduction performed by the Digic 4, 5, and 5+ processor varies based on user selection of non-default parameters for ISO and High ISO NR, through analysis of images taken of an X-Rite ColorChecker chart at different ISO levels. The functional testing confirms that ISO and High ISO NR are spatial noise characteristics, that default data is associated with default settings. The testing further raises a reasonable inference that information related to non-default settings is gathered and used to generate replacement data for the default data based on the information gathered related to the non-

default settings by the camera software as part of in-camera noise reduction.

(I.C. at 3-4).

But it simply is not the case that, because noise reduction performance varies with the use of camera features, the accused camera must be practicing the method set out in any claim of the '982 patent.  More to the point, the purpose of the Infringement Contentions is to avoid allowing such conclusory allegations to serve as a basis for discovery.  Plaintiff must explain the reasonable basis for its belief that *each* limitation of the claims at issue is infringed.  *Droplets*, 2013 WL 1563256, at *2.  It has not.  On the contrary, the Infringement Contentions do nothing more than rephrase the limitations of the claim in the context of functional testing revealing that the accused camera accomplishes the same outcome as the '982 patent.  As both parties must know, this is not enough.  *See CSR Tech. Inc.* v. *Freescale Semiconductor*, No. C-12-02619 (RS) (JSC), 2013 WL 503077, at *3 (N.D. Cal. Feb. 8, 2013) ("As a result, Plaintiff's contentions consist of nothing more than a conclusion based on information and belief that since calibration in the Accused Products occurs, it must occur according to the claimed method.  Such contentions do not satisfy [the Rules]...." (internal quotation marks omitted)).[13]

---

[13]   As noted at the appropriate points throughout the remainder of this Opinion, each section of the Infringement Contentions simply restates the same observations as each other section, referring to a different processor — the Digic 4, the Digic 5, or the Digic 5+ — with no other alterations. For the same reasons, then, the entirety of the Infringement Contentions is inadequately specific.

There are also problems concerning Plaintiff's reliance on certain cameras' Long Exposure Noise Reduction feature.[14]  By way of background, in support of the "generating" identification with respect to the EOS 5D Mark II, Plaintiff points to the Claim Charts devoted to the "gathering" step of the Rebel T3i, another accused camera employing the Digic 4 processor.  (Claim Charts at 136-37).  The identified pages identify infringing behavior due to the Rebel T3i's Long Exposure Noise Reduction feature.  In particular, the chart displays a long-exposure image captured in a completely dark room, showing the noise generated by the long-exposure capture process.  (*Id.* at 136).  Adjoining, it also displays another long-exposure image captured in the same room with the advantage of the Rebel T3i's Long Exposure Noise Reduction feature, showing almost no visual distortion.  (*Id.*).

Plaintiff explains that these records of its functional testing show that the accused camera "gathers information related to the spatial noise characteristics of the camera by taking a dark frame image subsequently after taking the original image."  (Claim Charts at 136-37).  Given the level of specificity required at this stage, this identification of the "gathering" limitation suffices under the Rules.  *See Whipstock Servs., Inc.* v. *Schlumberger Oilfield*

---

[14]    "Long exposure" refers to images captured by leaving the image sensor exposed for a period of time, such as five minutes, significantly longer than the very brief exposure common in conventional photography.  Such long exposures generate their own visual distortions to the captured image due to the unaccustomed heating of camera components under prolonged activity.  Long Exposure Noise Reduction is a feature that seeks to remove this image by capturing, immediately after the long-exposure image is captured, another image with the image sensor charged for an equal period of time but with the lens shutter closed.  This produces a second image showing only the distortion caused by the camera's activity itself, which can subsequently be scrubbed from the captured image.  (*See* Claim Charts at 19).

*Servs.*, No. 6:09-CV-113, 2010 WL 143720, at *2 (E.D. Tex. Jan. 8, 2010) ("At this stage of the case, Plaintiff's infringement contentions are sufficient.... Contrary to Defendant's assertion, Plaintiff has not blindly accused Defendant's operations. Plaintiff has descriptively identified certain operations.")

Here, Plaintiff's contention fails at the "generating" limitation.[15]  The Claim Charts continue: "[The Long Exposure Noise Reduction feature] then generates replacement data and utilizes it in order to [subtract] it and minimize the noise of the original image." (Claim Charts at 137).  This attempt to identify the "generating" limitation fails for lack of specificity.

The parties clash at length in their briefs, as they did at the July 24, 2013 conference, over whether it is appropriate even to discuss the meaning of the "generating" limitation at this stage without engaging in the full process of claim construction.  (*See, e.g.*, 7/24/13 Tr. 9:15-22, 18:24-19:12, 23:6-24:4). The parties also have very different conceptions of the term "generating." Defendants contend that the existence of the "generating" limitation necessarily implies that the replacement data involved in the fourth claim limitation must be different in some way from the gathered data involved in the second claim limitation.  (Def. Br. 12, 15; Def. Reply 7).  Plaintiff insists that "it really does

---

[15]    It bears noting that, though Plaintiff included lengthy and detailed charts for every other element of the asserted claims with respect to the nine accused cameras, in each case its "generating" citation consisted only of secondary citations to material elsewhere in the Claim Charts or Infringement Contentions, often originally adduced in support of different limitations.  At the least, this was a curious and confusing way to design its submissions.  At most, the Court could conclude that Plaintiff was either unwilling or unable to adduce independent material in support of its "generating" identification. (*See* Claim Charts at 177).

28

not matter at all whether the gathered information and the replacement data are in fact the same."  (7/24/13 Tr. 24:13-15; *see also* Pl. Opp. 15-16).

The interaction between the burden of proof required at the infringement contention stage and the more elaborate demonstration necessary for claim construction is a complicated one, especially where, as here, the parties have clearly opposing views of a claim term that yield fundamental differences in the scope of discovery.  The Court need not enter that thicket, however.  Plaintiff has failed to make an adequately specific identification with respect to the "generating" limitation.

The Claim Charts cited for the EOS 5D Mark II make a single reference to generating data: having observed that the Long Exposure Noise Reduction feature "gathers information … by taking a dark frame image subsequently after taking the original image," the Charts go on to state with no evidence or analysis that the feature "then generates replacement data and utilizes it in order to [subtract] it and minimize the noise of the original image."  (Claim Charts at 136-37).  Contrary to Plaintiff's avowed position before the Court and in its brief, this statement certainly does not suggest that the Long Exposure Noise Reduction feature uses the gathered data as the replacement data without producing any new data; on the contrary, it explicitly says the opposite, that the feature "then generates replacement data."  (*Id.*).

Regardless of what Plaintiff maintains as its understanding of the "generating" term, or of the merits thereof, it is not explained with adequate specificity.  The single sentence fragment regarding the "generating" limitation

29

could not possibly put Defendants on notice regarding Plaintiff's reasonable basis to believe that the accused camera practices the "generating" limitation of the claim.  Nor does it adequately explain, even at the high level of generality arguably necessitated by Plaintiff's lack of access to Defendants' source code, how Plaintiff believes the camera performs any kind of generation at all.

It may be the case, though the Claim Charts suggest the contrary, that Plaintiff believes an infringing feature might perform the "generating" step without actually altering the gathered data at all.  But Plaintiff did not say as much in its Infringement Contentions or its Claim Charts; nor, despite its representations at the July 24, 2013 conference, did it do so in its briefing. The relevant section of Plaintiff's opposition brief argues that it had "clearly articulate[d] an infringement theory" by noting that the Long Exposure Noise Reduction feature gathered information by taking a closed-shutter image, and that that closed-shutter image provided the replacement data.  (Pl. Opp. 15-16).  The absence here of even a passing reference to the "generating" step is noteworthy.  Plaintiff cannot contend it made an adequately specific identification of the "generating" limitation when it made no identification at all.  In sum, Plaintiff has failed to make an adequately specific identification of the location of the "generating" limitation of the '982 patent claims with respect to the EOS 5D Mark II or its cognate cameras, the EOS 7D, the EOS 60D, and the EOS Rebel T3i.

### ii.    The EOS Rebel T4i

Similar problems beset the Claim Charts for the "generating" limitation with respect to the EOS Rebel T4i and its cognate cameras, the PowerShot G1X and the PowerShot S100.  (*See* Claim Charts at 185, 220, 254).  The relevant section of the Charts refers to a different section of the Infringement Contentions than that cited for the EOS 5D Mark II, this time concerning the Digic 5 processor instead of the Digic 4 processor.  Plaintiff also relies on two features of the accused camera, Long Exposure Noise Reduction and Chromatic Aberration Correction.  (Claim Charts at 185-86).[16]  Only the Chromatic Aberration Correction feature provides any independent support for Plaintiff's efforts to identify the "generating" limitation in the Rebel T4i.[17]  And it is no more sufficient than the Long Exposure Noise Reduction feature addressed in the preceding section.

The relevant Claim Chart section explains that the Chromatic Aberration Correction feature "gathers the information related to the [lens] being used in order to perform the correction," and that functional testing shows that the feature "reduced" visual distortion, indicating that the accused camera "must gather information from the [lens] and/or the taken image itself."  (Claim

---

[16]    The Chromatic Aberration Correction feature allows the camera to modify visual distortion caused by an external lens.  The camera can recognize the active lens and call up data regarding its color distorting characteristics, allowing image enhancement tailored to the hardware employed for each image.  (*See* Claim Charts at 177).

[17]    The cited claim chart material regarding the Long Exposure Noise Reduction feature is identical to that incorporated in the Claim Charts for the EOS 5D Mark II and for the same reasons fails to pass muster under the Rules.  (*Compare* Claim Charts at 135-37, *with id.* at 173-75).  In the same way, the cited portions of the Infringement Contentions are identical to the portions of the Infringement Contentions on which the Claim Charts for the EOS 5D Mark II, and are inadequate for the same reasons as stated above.  (*Compare* I.C. at 5-8, *with id.* at 9-15).

31

Charts at 177-78).  This section does not suggest, even in a tenuous manner, any potential relationship between the feature and data generation.  It is, therefore, facially inadequate.

Plaintiff seeks to bolster this identification in its brief.  Even if material submitted in a brief could permissibly supplement the Infringement Contentions and Claim Charts, which it cannot, Plaintiff's efforts would fail on their own terms.  Plaintiff's brief provides the metadata for an image taken by a camera with Chromatic Aberration Correction functionality, notes that the camera records information regarding the active lens as part of each captured image's metadata, and concludes that "there is, at a minimum, a *reasonable inference* that the gathered lens information is used to generate replacement lens data by the camera software."  (Pl. Opp. 14 (emphasis added)).  This conclusory assertion, even had Plaintiff included it in the Claim Charts, would still fail to satisfy the Rules because the inference is not reasonable: there is no obvious relationship between recording data and generating data, much less between recording the serial number of the lens used to capture an image and generating replacement spatial noise characteristic data.[18]

In point of fact, however, Plaintiff did not include this statement or anything similar in the Claim Charts.  New content submitted for the first time in a brief defending the adequacy of Claim Charts from a motion to strike

---

[18]    Plaintiff might rejoin, as it has elsewhere, that whether generated data can be identical to gathered data is a matter for claim construction, not the Infringement Contentions. That may be, but for Plaintiff to succeed in saving the Chromatic Aberration Correction identification, it should have (i) made such the argument in its Claim Charts, and (ii) explained in its Claim Charts that the recorded lens data is identical to the data generated by the Chromatic Aberration Correction feature.

cannot suffice to prove that those Claim Charts were independently adequate. *See Droplets*, 2013 WL 1563256, at *3 (rejecting new information included in an opposition to a motion to strike because the information did "not emerge from the infringement contentions themselves").  Plaintiff may hope here as well to argue that replacement data can be identical to gathered data.  The Court again offers no conclusion with respect to the merits of that argument, because Plaintiff did not make such an argument in its Infringement Contentions and Claim Charts.

### iii.    The EOS 5D Mark III

The Claim Charts for the "generating" limitation on the EOS 5D Mark III are equally deficient.  The relevant section of the Charts refers to a different section of the Infringement Contentions, relating to the Digic 5+ processor instead of the Digic 5 processor, and again relies on the Long Exposure Noise Reduction and Chromatic Aberration Correction features.  (Claim Charts at 293).  No element of this material provides independent support for the "generating" limitation.[19]

### iv.    The EOS-1D X

Finally, the Claim Charts for the "generating" limitation for the EOS-1D X are inadequate.  The relevant portion cites to a section of the Infringement Contentions relating to the Digic 5+ processor; it restates verbatim the

---

[19]    Once again, the cited portions of the Infringement Contentions are identical to the portions of the Infringement Contentions on which the Claim Charts for the EOS Rebel T4i rely, and are inadequate for the same reasons.  (*Compare* I.C. at 9-15, *with id.* at 16-20).  The identified features are also deficient for the reasons stated above.

observations made throughout the rest of the Infringement Contentions and is unavailing for the reasons explained above. (Claim Charts at 334). The EOS-1D X Claim Charts also rely on the Long Exposure Noise Reduction and Chromatic Aberration Correction features, referring to citations that repeat or substantively recapitulate language the Court has already dismissed as deficient. (*Id.*). These citations fail for the same reasons.

The EOS-1D X "generating" citation contains a single variation: it points to citation 1b(5) under the EOS 5D Mark III. Oddly, this evidence is not adduced for the "generating" citation with respect to the EOS 5D Mark III itself, and it seems likely its inclusion for the EOS-1D X was a typographic error. Nonetheless, even if intentional, this citation offers no better support. It describes the ability of the user to change the setting of the camera's High ISO Speed Noise Reduction feature. (Claim Charts at 284). As explained above, Plaintiff does not anywhere adequately explain why it believes the High ISO Noise Reduction feature infringes a claim of the '982 patent, and this citation is no different.

In sum, no portion of the Infringement Contentions or their supporting Claim Charts adequately identifies the "generating" limitation of claim 1 and its dependent claims 2 and 4 of the '982 patent with respect to any accused camera. The Infringement Contentions and Claim Charts must be struck on this basis alone.

### b. Plaintiff Also Fails to Identify the "Providing" Limitation

Plaintiff's materials are also inadequate with respect to the "providing" limitation. Plaintiff nowhere makes clear what data is "provided" by any feature of the accused cameras. The implication throughout Plaintiff's materials is that certain classes of user inputs serve as the default data for purposes of the "providing" limitation, such as turning a feature on or adjusting its level of activity (e.g., changing the Long Exposure Noise Reduction setting from "Auto" to "On," or adjusting the ISO setting from 400 to 800). (*See, e.g.*, Claim Charts at 9-13 (indicating that a table shows the "default settings (pre-determined default values)" and that another table indicates those settings can be "customized by the user"), 45-50 (same), 84-90 (same), 271-76 (same), 311-18 (same); *see also* Claim Charts at 126, 131-32 (indicating that a table shows the "default settings (pre-determined default values)" and that another table indicates those settings can be "defined by the user"), 163-67 (indicating that a table shows the "default settings (pre-determined default values)," and that another table indicates that "the user can change the default settings"), 202-07 (indicating that a table shows the "default settings … in different modes"), 236-41 (same)). Though the Court offers no opinion on the merits of this construction of the "providing" limitation, it must conclude that these identifications are insufficiently specific, listing as they do numerous settings referenced nowhere else in the Infringement Contentions or Claim Charts. These sweeping identifications of numerous settings as "default data" could serve as an impermissibly broad basis for discovery and certainly do not

suffice to "crystallize" Plaintiff's infringement allegations.  *InterTrust*, 2003 WL 23120174, at *3.

Nor does Plaintiff adequately associate these identifications, as it must, with a coherent allegation against a camera process that allegedly practices a method claimed in the '982 patent.  For example, though Plaintiff's Claim Charts recite that "[d]efault settings for spatial noise characteristics are structured by the accused camera software as default data" (*see, e.g.*, Claim Charts at 9), nowhere in the subsequent citations does Plaintiff identify any specific default setting as providing the default data for a specific feature of an accused camera.  Plaintiff generally fails even to identify the settings that are relevant to its allegations.

Plaintiff's opposition to the instant motion does what the Claim Charts should do: it cites the repeated claim-chart statement that "[d]efault settings for spatial noise characteristics are structured by the accused camera software as default data," and contends that this statement "includes data corresponding to the default setting for ISO."  (Pl. Opp. 12).  Had Plaintiff included this statement in its Claim Charts, conclusory as it is, this issue might be closer.  But Plaintiff did not do so, and the specificity requirement of the Rules cannot be satisfied by intimations from other sections of the Claim Charts.  *InterTrust*, 2003 WL 23120174, at *3; *Droplets*, 2013 WL 1563256, at *3.

As it happens, Plaintiff does not even consistently espouse the identifications discussed above.  In its opposition to the instant motion,

Plaintiff argues, at least with respect to the Long Exposure Noise Reduction feature, that the relevant default data is *not* the feature's default setting, but rather the "original default noisy image data" captured by the long exposure itself. (Pl. Opp. 15). Similarly, when defending its reliance on the Chromatic Aberration Correction feature, Plaintiff argues that "[w]hen non-default lenses are used by the end user, the accused camera software gathers the non-default lens information and replaces, at a minimum, that default data," indicating that the default data is *not* the feature's default setting (e.g., "On" or "Off"), but rather the default chromatic aberration information associated with the accused camera's default lens. (*Id.* at 14). As discussed above, Plaintiff's briefing on this motion to strike cannot salvage the Infringement Contentions and Claim Charts, which rise or fall on their own merits. *See Droplets*, 2013 WL 1563256, at *3. By the same token, Plaintiff's brief cannot worsen the Infringement Contentions or Claim Charts. But the fact that Plaintiff fails to defend its submissions in a manner consistent with the argument presented in those submissions further illustrates their impermissible imprecision.

Plaintiff acknowledges that the Rules require it to identify why it believes "that the camera software performs the steps of the claimed method." (Pl. Opp. 7). Plaintiff has failed to meet the burden of the Rules; it has not specifically identified a "method or process ... which, when used, allegedly results in the practice of the claimed method or process." Rule 1-1(b). Ambiguous, insufficiently articulated, and lacking a clear relationship to each limitation of

any asserted patent claim, the Infringement Contentions in support of the "providing" limitation are inadequate.

**4.    The Appropriate Remedy Is to Strike the Infringement Contentions with Leave to Amend**

The Infringement Contentions and Claim Charts must be struck.  The combination theory is unspecific and unexplained, and Plaintiff's efforts to identify particular features that infringe the '982 patent's claims do not, at a minimum, adequately identify the "providing" or the "generating" limitation of any method claimed in the '982 patent.

Defendants note that the Court can strike the Infringement Contentions with prejudice.  (Def. Br. 8).  As discovery cannot proceed under the Rules without valid Infringement Contentions, such an order would in effect announce an end to this litigation.  Such a functional dismissal is not appropriate where, as here, a lesser and more appropriate sanction exists: striking with leave to file Second Revised Preliminary Infringement Contentions and supporting Claim Charts.  *See, e.g.*, *Samsung SDI Co., Ltd.* v. *Matsushita Elec. Indus. Co., Ltd.*, No. CV 05-8493 (PA) (SJHX), 2006 WL 5097360, at *1 n.1 (C.D. Cal. June 5, 2006) (collecting cases).  This remedy avoids the draconian result of functional dismissal, while also requiring Plaintiff, if it continues to press this action, to comply with the Rules and provide an adequate basis for discovery.  If Plaintiff continues to file inadequate Infringement Contentions and supporting Claim Charts, however, a more conclusive remedy may be required in the future.

## CONCLUSION

For the reasons set forth above, Defendants' motion to strike Plaintiff's Infringement Contentions is GRANTED.

It is hereby ORDERED that Plaintiff may file Second Revised Preliminary Infringement Contentions and supporting Claim Charts by January 17, 2014.

SO ORDERED.

Dated: December 13, 2013
      New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge